UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

PALM HOUSE HOTEL LLLP,
SOUTH ATLANTIC REGIONAL CENTER, LLC,
JOSEPH J. WALSH, SR., and
ROBERT V. MATTHEWS,

    Defendants, and

160 ROYAL PALM, LLC and
UNITED STATES REGIONAL ECONOMIC DEVELOPMENT AUTHORITY LLC
D/B/A/ EB5 PETITION,

    Relief Defendants.
_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

## I. INTRODUCTION

1. The Commission brings this action against Palm House Hotel LLLP ("PHH"), South Atlantic Regional Center, LLC ("SARC"), Joseph J. Walsh, Sr., and Robert V. Matthews ("Defendants") for violating the antifraud provisions of the federal securities laws.

2. Since 2012, Walsh, his entities, and Matthews defrauded investors participating in the Immigrant Investor Program ("EB-5 Program") administered by the United States Citizenship and Immigration Services ("USCIS"). The EB-5 Program provides foreign nationals the opportunity to qualify for permanent residency in the United States through an investment of

money in projects in the United States which, among other things, create a certain number of jobs.

3. From November 2012 to March 2015, PHH offered and sold at least $43,991,458 in PHH securities to at least 88 foreign investors through the EB-5 Program. The offering materials provided to investors represented that PHH would loan investor funds to Palm House LLC ("Palm House") to acquire, develop, and operate the Palm House Hotel ("Hotel") located in Palm Beach, Florida. Instead, Walsh and Matthews misappropriated a significant portion of the investor funds. Walsh, PHH, and SARC also made false and materially misleading statements regarding: (1) the use of investor funds; (2) the use of an escrow account to hold investor funds prior to disbursement to Palm House; (3) the existence of conditions precedent to the advancement of loan disbursements to Palm House; (4) the guaranteed return of investors' funds if their I-526 petitions (Immigrant Petition by Alien Entrepreneur) were denied; (5) Walsh and Matthews' backgrounds; (6) the preparation and periodic disclosure to investors of PHH financial reports; (7) Palm House's repayment of the loan in monthly installments; and (8) Palm House's purported ownership of and investment in the Hotel prior to the commencement of the PHH offering. Matthews participated in the scheme and, with the exception of misrepresentations (2), (4) and (6) above, aided and abetted Walsh and his entities in making these material misrepresentations and omissions. To date, the Hotel has not been completed and is subject to a foreclosure suit and receivership.

4. By engaging in this conduct, (a) PHH, SARC, and Walsh violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; and (b) Matthews violated Sections 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and (a)(3), and Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and (c), 17 C.F.R. §§ 240.10b-5(a) and (c), and aided and abetted PHH, SARC, and Walsh's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and Section10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

5. Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

II. **DEFENDANTS AND RELIEF DEFENDANTS**

A. **Defendants**

6. **PHH** is a Florida limited liability limited partnership located in Royal Palm Beach, Florida. PHH offered limited partnership interests to investors in $500,000 increments. Investor funds were to be loaned to Palm House to acquire, develop, and operate the Hotel. SARC is the general partner of PHH. Walsh, through his control of SARC, controlled PHH.

7. **SARC** is a Florida limited liability company located in Royal Palm Beach, Florida. SARC is a USCIS designated Regional Center. From its inception in June 2010 to at least April 2016, Walsh was the manager of SARC. Thereafter, USREDA Holdings LLC, another Walsh managed and controlled company, became the manager of SARC.

8. **Walsh** is a resident of Royal Palm Beach, Florida. During the relevant time, Walsh was the manager of SARC and United States Regional Economic Development Authority LLC d/b/a/ EB5 Petition ("USREDA"), the managing member of USREDA Holdings LLC, and controlled each of these entities and PHH.

9. **Matthews** is a resident of Palm Beach, Florida. Matthews controlled Palm House and 160 Royal Palm, LLC ("160 Royal"), the entity that owns the Hotel, and controlled the day-to-day operations of the Hotel. Matthews also controlled two other entities that he used, respectively, to purchase real estate with misappropriated investor funds and to title and pay for

expenses associated with a 151-foot yacht. In addition, Matthews also directed the transfer of investor funds that, through a series of transactions, were used to purchase his former home in Connecticut out of foreclosure or otherwise benefit the home. In November 2017, Matthews filed for Chapter 11 bankruptcy. In re Matthews, No. 17-23426 (Bankr. S.D. Fla. filed Nov. 6, 2017). In March 2018, a federal grand jury returned an indictment against Matthews, charging him with, among other things, wire and bank fraud in connection with his activities related to PHH and Palm House. United States v. Matthews, No. 3:18-cr-00048-SRU (D. Conn. filed Mar. 14, 2018).

  **B.** **Relief Defendants**

  10. **160 Royal** is a Florida limited liability company located in Palm Beach, Florida. 160 Royal owns the Hotel. A real estate developer ("Developer") owned 100% of the membership interest in 160 Royal until August 30, 2013, when he assigned his interest to Palm House in exchange for 160 Royal granting Developer a $27,468,750 mortgage on the Hotel. Subsequent to this transaction, Matthews controlled 160 Royal through his control of Palm House. 160 Royal received investor funds, some of which were misappropriated by Matthews.

  11. **USREDA** is a Delaware limited liability company located in Royal Palm Beach, Florida. Walsh controlled and was the manager of USREDA from its inception in August 2012 until April 2016, when USREDA Holdings LLC became the manager of USREDA. USREDA handles business activities and USCIS petition work for PHH and other SARC-associated offerings. USREDA received investor funds which were fraudulently obtained by Walsh and his entities.

### III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a); and Sections 21(d)(1) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1) and 78aa(a).

13. The court has personal jurisdiction over Defendants and Relief Defendants and venue is proper in the Southern District of Florida because Defendants and Relief Defendants reside or transact business in this district and/or participated in the offer or sale of securities in this District, and many of the acts and transactions constituting violations of the Securities Act and the Exchange Act alleged in this Complaint occurred in this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

14. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

### IV. THE EB-5 PROGRAM

15. Congress created the EB-5 Program in 1990 in an effort to boost the United States economy. The EB-5 program provides a prospective immigrant the opportunity to become a permanent resident by investing in the United States.

16. To qualify for an EB-5 visa, a foreign applicant must invest $500,000 or %1 million (depending on the type of investment) in a commercial enterprise approved by the U.S Citizenship and immigration Service ("Immigration Service"). Once the foreign applicant has invested, he or she may apply for a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant

may apply to have the conditions removed from his or her green card. The applicant can then live and work in the United States permanently.

17. A certain number of EB-5 visas are set aside for prospective immigrants who invest through a Regional Center, such as SARC. An applicant only has to invest $500,000 if he or she invests through a Regional Center, such as SARC.

## V. FACTUAL BACKGROUND

### A. The Hotel

18. In August 2006, Matthews purchased the Hotel through his ownership of an entity. In 2009, that entity lost the Hotel via foreclosure and Developer acquired it through his ownership of 100% of the membership interest in 160 Royal. On August 30, 2013, Developer assigned his 100% membership interest in 160 Royal to Palm House. Matthews' brother, Gerry Matthews ("G. Matthews") assumed a 99% membership interests in Palm House as nominee for Matthews, who actually controlled Palm House. Another individual, "R.B.," assumed a 1% membership interest in Palm House.

### B. PHH's EB-5 Securities Offering

19. From November 2012 until March 2015, PHH raised at least $43,991,458 in investor funds from at least 88 foreign investors through an EB-5 offering of PHH limited partnership interests. The offering materials provided to investors represented that PHH would loan investor funds to Palm House to acquire, develop, and operate the Hotel.

20. Walsh, PHH, and SARC disseminated at least three versions of PHH's EB-5 offering documents and marketing materials (collectively, "offering materials") to investors over the years. Each version included a private placement memorandum ("PPM"), to which a business plan, loan documents between PHH and Palm House ("loan documents"), a subscription agreement, a limited partnership agreement, and an escrow agreement were attached. PHH

combined these materials into a multi-hundred page investment portfolio. The investment portfolio also contained an "EB-5 Investor Documents & Process Guide," a fee agreement, and a USREDA/SARC Service Agreement. To streamline and expedite the closing of an investment, PHH provided a booklet which contained only the signature pages of the documents necessary for investors to make their investments and file their I-526 petitions with the USCIS.

21. PHH's offering materials also included various versions of a project brochure that was translated into Chinese and Farsi ("brochures") and a document titled "EB5 Petition" that explained the EB-5 process. PHH's offering materials appeared under some combination of PHH, Palm House, SARC, and USREDA's names, and the Hotel and SARC's logos.

22. PHH, through Walsh and others, solicited investors through sales agents. PHH provided the sales agents with an email that included links to its investment portfolio, the brochure, and the "EB5 Petition" document. Each investor or the sales agent for the investor received a copy of the relevant offering documents prior to investing.

23. Walsh and USREDA's in-house counsel each participated in creating PHH's offering materials. The in-house counsel drafted PHH's PPMs, business plans, loan documents and subscription, limited partnership, and escrow agreements with information provided by Walsh and Matthews. Walsh reviewed and approved all of these documents. Walsh also signed some of these documents, including the "EB5 Investor Documents & Process Guide" as president and managing partner of SARC and USREDA, the fee agreement as president of SARC, and at least one version of the USREDA/SARC Service Agreement on behalf of USREDA. Further, Walsh edited, reviewed, and approved various versions of the brochure and "EB5 Petition," and signed a letter included in the EB5 Petition as "C.E.O./President USREDA, Inc."

24. Matthews directly and indirectly provided information to Walsh and the in-house counsel that was included in PHH's PPMs and business plans, and received and reviewed drafts of other documents included in the offering materials provided to investors, including the brochure.

25. As the control person of Palm House, Matthews directed R.B. to sign one version of the loan documents as managing member of Palm House because Matthews did not want to sign them himself.

26. Matthews also met with sales agents, investors, and prospective investors multiple times regarding the Hotel project.

  C. **Material Misrepresentations and Omissions to PHH Investors**

    1. **Misappropriation of Investor Funds by Walsh, PHH, SARC, and Matthews**

27. Between November 2012 and at least December 2014, the offering materials misrepresented that investor funds would be loaned to Palm House to acquire, develop and operate the Hotel. In reality, PHH, SARC, and Walsh misappropriated approximately $13,578,000 of investor funds. First, Walsh kept at least $8,078,000 of investor funds earmarked for the Hotel project. Walsh co-mingled these funds with other funds he controlled for his own use and to pay expenses unrelated to the Hotel project. Second, in December 2013, Walsh loaned Matthews at least $5.5 million of investor funds to save Matthews' personal Palm Beach, Florida mansion from foreclosure. The loan, which was undocumented, was never disclosed to investors. In March 2014, Matthews sent Walsh an email expressing his "gratitude" for Walsh "saving [his] house."

28. Between approximately June 2014 and December 2014, Matthews misappropriated at least $3.4 million of investor funds to obtain title for and pay expenses

associated with a 151-foot yacht and a piece of property located next to the Hotel. Both were titled in the names of entities owned and controlled by a member of Matthews' family. Matthews' use of investor funds in this manner was neither permitted by the offering materials nor disclosed to investors.

29. Between February 2014 and June 2014, Matthews also directed the transfer of approximately $4.5 million of investor funds that, through a series of transactions, were used to purchase his former home in Connecticut out of foreclosure and for other related expenses. Matthews then extracted $1.2 million from the Connecticut home through a business purpose loan secured by the property, from which he and his family received $825,000.

### 2. Misrepresentations Regarding Escrow Requirements and the Return of Investor Funds

30. Between November 2012 and at least June 2014, PHH's offering materials contained material misrepresentations regarding PHH's use of an escrow account for investor funds. PHH falsely and fraudulently claimed that investor funds would be held in an escrow account at PNC Bank, pursuant to an escrow agreement between PHH, SARC, and PNC Bank, through at least the filing of the investor's I-526 petition. Contrary to these representations, no escrow account even existed for investor funds. Prior to the PHH offering, the former CFO for SARC and USREDA informed Walsh that the account receiving investor funds would not even be administered by PNC Bank.

31. PHH's offering materials also contained material misrepresentations regarding the return of funds paid by investors. PHH's PPMs falsely and fraudulently stated that if an investor's I-526 petition were denied by the USCIS for reasons "within the control" of PHH, the investor's funds would be returned without deduction. The offering materials and SARC's own website also falsely, fraudulently, and repeatedly stated that investors' funds would be returned if

their I-526 petitions were denied generally or without "cure." For example, the brochures stated that "[USREDA] and South Atlantic Regional Center offers a 100% Full Refund of all fees and investment if your I-526 is not approved." Some of these documents and SARC's website falsely and fraudulently referred to the promise of a return of the funds as a money back "guarantee."

32. PHH, SARC, and Walsh knew or recklessly disregarded that USREDA and SARC would not be able to repay investors whose petitions were denied because they misappropriated for their own use millions of dollars of investor funds, and never escrowed investor funds prior to their release to Palm House. To date, the USCIS has denied all of the investor I-526 petitions except one, for which it has issued a Notice of Intent to Deny. The USCIS denied the I-526 petitions because, among other reasons, investors failed to demonstrate that the Hotel project would create sufficient jobs given the uncertainty of the project's future. PHH never returned any money to investors.

### 3. Misrepresentations and Omissions Regarding Walsh and Matthews' Backgrounds

33. PHH's PPMs and business plans contained misrepresentations and omissions regarding the backgrounds of Walsh and Matthews, who are both described in a section on "Management." The description of Walsh's background, which he drafted, stated that he "has extensive experience in merger and acquisition strategy and law" and experience with "the intricacies of U.S. Securities and Exchange laws." Walsh did not have any such merger and acquisition or securities law experience.

34. Matthews was described as the chairman of Matthews Ventures Holdings, LLC ("MVH"), a diversified holding company with interests in, among other things, real estate, hotels, and construction. However, PHH's PPMs and business plans materially omitted that in

2009, one of Matthews' companies, PB Realty Holdings LLC, was placed into involuntary bankruptcy with subcontractors obtaining approximately $2 million in judgments against Matthews, and that Matthews had lost to foreclosure both his own home, as well as the very Hotel in which investors were purportedly investing. Matthews provided his biography to the in-house counsel for inclusion in the PPMs.

35. The offering materials also included a section on G. Matthews but did not disclose that he was a nominee for Matthews in the ownership of the Hotel because of Matthews' financial problems, a material omission. Walsh knew G. Matthews was a nominee for Matthews because of Matthews' financial problems.

### 4. Other Misrepresentations to PHH investors

36. PHH's offering materials also materially misrepresented the conditions under which investor funds would be loaned to Palm House. In particular, the PPMs stated, "it shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets or financial condition of the [b]orrower and its subsidiaries, taken as a whole." The loan documents made similar representations and stated that the determination as to material adverse changes would be made by PHH. Walsh and PHH—which loaned at least $30,413,462 of investor funds to Palm House—never ascertained whether Palm House met these pre-conditions for any loan advance.

37. Matthews' misappropriation of approximately $7.9 million dollars of investor funds represented material and adverse changes in the operations, assets, and financial condition of Palm House, 160 Royal, and the Hotel, all of which he controlled. Despite being granted the authority by the loan documents to access Palm House's financial statements and the right to inspect its books and records, PHH never exercised this authority.

38. The offering materials also materially misrepresented that PHH would provide audited financial statements or other financial information to investors on an annual or quarterly basis. PHH never prepared audited financial statements and did not provide audited statements, or any other financial reports, to investors.

39. The offering materials also misrepresented that Palm House would make monthly interest payments to PHH on its loan for five years. Palm House did not make any monthly interest payments to PHH.

40. In order to bolster investor confidence in PHH's securities offering, PHH's business plans and brochures also made materially misleading statements suggesting that Palm House had substantial funds at stake in the Hotel, and that investor funds were only part of an already well-financed development project. Based on information provided in part by Matthews, PHH's business plans falsely and fraudulently represented that Palm House had $22 million in equity in the Hotel, and the brochures fraudulently stated the project was "very safe" based in part on a substantial equity investment from Palm House. In reality, Palm House acquired the Hotel on August 30, 2013 through a $27,468,750 mortgage on the Hotel, with no pre-existing equity in the Hotel.

D. **Relief Defendants**

41. Matthews controlled 160 Royal and its bank accounts through his control of Palm House. During the course of the fraudulent scheme, PHH, Walsh, and SARC advanced millions of dollars of investor funds to 160 Royal. During this same time period, Matthews diverted millions of dollars of investor funds from 160 Royal to other accounts he controlled.

42. Walsh controlled and was the manager of USREDA, which handled business activities and USCIS petition work for PHH and other SARC-associated offerings. USREDA

received millions of dollars of investor funds which were fraudulently obtained by Walsh and his entities.

## VI.  CLAIMS FOR RELIEF

### Count I
### Violations of Section 17(a)(1) of the Securities Act
### (Against PHH, SARC, Walsh, and Matthews)

43. The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

44. From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed any device, scheme or artifice to defraud.

45. By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### Count II
### Violations of Section 17(a)(2) of the Securities Act
### (Against PHH, SARC, and Walsh)

46. The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

47. From no later than November 2012 through March 2015, PHH, SARC, and Walsh, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

48.    By reason of the foregoing, PHH, SARC, and Walsh violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### Count III
### Violations of Section 17(a)(3) of the Securities Act
### (Against PHH, SARC, Walsh, and Matthews)

49.    The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

50.    From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit.

51.    By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

### Count IV
### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against PHH, SARC, Walsh, and Matthews)

52.    The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

53.    From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

54.    By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## Count V
### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against PHH, SARC, and Walsh)

55. The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

56. From no later than November 2012 through March 2015, PHH, SARC, and Walsh, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

57. By reason of the foregoing, PHH, SARC, and Walsh violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## Count VI
### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act
### (Against PHH, SARC, Walsh, and Matthews)

58. The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

59. From no later than November 2012 through March 2015, PHH, SARC, Walsh, and Matthews, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of any security, knowingly or recklessly engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon any person.

60. By reason of the foregoing, PHH, SARC, Walsh, and Matthews violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## Count VII
### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act
### (Against Matthews)

61.   The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

62.   From no later than November 2012 through March 2015, PHH, SARC, and Walsh, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and by reason of the foregoing violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

63.   From no later than November 2012 through August 2014, Matthews knowingly or recklessly provided substantial assistance to PHH, SARC, and Walsh's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and is in violation of this provision to the same extent as PHH, SARC, and Walsh.

64.   By reason of the foregoing, Matthews aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## Count VIII
### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against Matthews)

65.   The Commission repeats and realleges paragraphs 1 through 42 of this Complaint.

66.   From no later than November 2012 through March 2015, PHH, SARC, and Walsh, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading in connection with the purchase or sale of any security, and by reason of the foregoing violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

67. From no later than November 2012 through August 2014, Matthews knowingly or recklessly provided substantial assistance to PHH, SARC, and Walsh's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), and is in violation of these provisions to the same extent as PHH, SARC, and Walsh.

68. By reason of the foregoing, Matthews aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A. Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them from violating the federal securities laws alleged in this Complaint.

### B. Disgorgement

Issue an Order directing Defendants and Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

C.  **Civil Penalty**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

D.  **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VIII. RETENTION OF JURISDICTION

The Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants and Relief Defendants in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable petition or motion by the Commission for additional relief within the jurisdiction of this Court.

## IX. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: August 3, 2018

Respectfully submitted,

By: _____
Alejandro O. Soto
Senior Trial Counsel
Florida Bar No. 172847
Direct Dial: (305) 982-6313
Email: sotoal@sec.gov
Lead Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154