## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 9:18-cv-81038-DMM

**SECURITIES AND EXCHANGE COMMISSION,**

       **Plaintiff,**

**v.**

**Palm House Hotel, LLLP,** *et al.*,

       **Defendants and Relief Defendants.**

_____/

### PLAINTIFF'S MOTION TO STRIKE DEFENDANT JOSEPH J. WALSH, SR.'S
### ANSWER AND ENTER DEFAULT JUDGMENT
### <u>AGAINST HIM PURSUANT TO FED. R. CIV. P. 37</u>

**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300

Plaintiff Securities and Exchange Commission, pursuant to Federal Rules of Civil Procedure 37 and 55(b)(2), respectfully moves this Court to strike Defendant Joseph J. Walsh, Sr.'s ("Walsh") answer and affirmative defenses [D.E. 44] and enter default judgment of permanent injunction and other appropriate relief against him based on his failure to provide initial disclosures and serve an answer or any written response to interrogatories properly served on him, and his failure to otherwise defend this case and participate in pretrial discovery.  In support thereof, the Commission states as follows:

## I.      **INTRODUCTION**

The Commission alleges that Walsh and codefendant Robert V. Matthews ("Matthews"), and the entities they controlled,[1] engaged in various violations of the federal securities laws involving the offering and sale of securities through a scheme to defraud at least 88 foreign investors participating in an Immigrant Investor Program (the "EB-5 Program") administered by the United States Citizenship and Immigration Services ("USCIS").  [D.E. 1, ¶¶ 2-3, 19.]  The EB-5 Program provides foreign nationals the opportunity to qualify for permanent residency in the United States through the investment of money in projects in the United States which, among other things, create a certain number of jobs.  [*Id.* ¶ 2.]  By way of numerous misrepresentations and omissions of material fact, Defendants were allegedly able to obtain approximately $43,991,558 in investor funds that purportedly would be used to acquire, develop, and operate the Hotel located in Palm Beach, Florida.  [*Id.* ¶ 3.]  In reality, Walsh and Matthews misappropriated a significant portion of investor funds to finance personal transactions, including purchasing real estate by

---

[1] As detailed in the Complaint, Walsh controlled Defendants Palm House Hotel LLLP ("PHH") and South Atlantic Regional Center, LLC ("SARC"), and related entities United States Regional Economic Development Authority LLC d/b/a/ EB5 Petition ("USREDA") and USREDA Holdings LLC.  [D.E. 1, ¶¶ 6-8, 11.]  Matthews controlled Palm House LLC ("Palm House") and 160 Royal Palm, LLC, ("160 Royal"), the entity that owns the Palm Beach Hotel ("Hotel").  [*Id.* at ¶¶ 9-10.]

entities controlled by them, purchasing and paying for expenses associated with a 151-foot yacht, and purchasing Matthews' former $4.5 million Connecticut mansion out of foreclosure, among other things. [*Id.* ¶¶ 27-29.]

Walsh played a critical role in perpetuating the fraudulent scheme. Walsh substantially participated in the creation and dissemination of materially false and misleading offering documents and marketing materials (collectively, the "offering materials") concerning the EB-5 offering of limited partnership interests in PHH which Walsh controlled. Among other things, Walsh: (i) reviewed and approved all of the offering materials [*id.* ¶ 23]; (ii) signed certain offering materials [*id*]; and (iii) edited, reviewed, and approved various versions of a project brochure and a document titled "EB-5 Petition" explaining the EB-5 process. [*Id.*] Finally, Walsh knew that he and Matthews were misappropriating millions of dollars of investor funds. [*Id.* ¶¶ 3, 27-29, 41-42.] In sum, Walsh was a key participant in the fraudulent scheme detailed in the Commission's Complaint. Notwithstanding his key role, Walsh has abandoned defending this case since its inception and has failed to comply with pretrial discovery obligations in accordance with S.D. Fla. L.R. 16.1, the Federal Rules of Civil Procedure, and this Court's orders. [D.E. 21, 26, 47.]

Federal Rules of Civil Procedure 37(c)(1)(C) and (d)(1)(A)(ii) allow a party to move for default judgement when a party fails to identify witnesses and documents as required by Rule 26(a) or when a party, after being properly served with interrogatories under Rule 33, fails to serve its answers, objections, or a written response. In this case, the Court should enter a default judgment against Walsh because he has failed to provide initial disclosures and serve any answers, objections, or a written response to the Commission's First Set of Interrogatories which were properly served on Walsh on February 7, 2019. Additionally, Walsh has failed to respond to the undersigned's repeated communications concerning available dates to schedule his deposition and

Walsh's outstanding discovery.  This is not the typical case of a defendant engaging in gamesmanship to sidestep particular issues raised in discovery; instead, Walsh has completely abandoned the defense of this case and is an unresponsive Defendant.  By refusing to participate in the discovery process, Walsh has made it impossible for the Commission to proceed with its case against him, causing great prejudice to the Commission's goal of protecting the investors harmed by Walsh's conduct.  Given Walsh is currently residing at an unknown address in the Republic of China, has been completely unresponsive to the Commission's communications, and has abandoned his defense of this present case, the Commission respectfully requests this Court enter a default judgment against Walsh.

## II.    PROCEDURAL HISTORY

### A.    The Filing of the Present Case, Walsh's Answer, and His Delay Tactics

On August 3, 2018, the Commission filed its Complaint.  [D.E. 1.]  The Complaint alleges, among other things, that Walsh violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  Prior to the Commission filing its Complaint, Walsh took up residence in the Republic of China after questions were raised about his business dealings.  [D.E. 34.]  On October 31, 2018, after unsuccessfully attempting to serve Walsh with the Complaint and summons at four physical addresses in West Palm Beach, Florida – including an address Walsh identified to the Commission as his own and another address listed on his most recent Florida driver's license (neither of which were residential nor valid) – the Commission moved the Court to approve alternative service on him.[2]  [*Id.*]  The

---

[2] Walsh had actual notice of the Commission's Complaint and the summons issued to him approximately two months earlier as he filed a motion with the Court on August 28, 2018 requesting a 60-day extension to answer the Complaint on behalf of himself and two entities he controlled.  [D.E. 12.]  The Court denied his request and instead granted a 21-day extension. [D.E. 13.]

Court granted the Commission's motion for approval of alternative service on November 6, 2018 [D.E. 36], and the Commission effected service on Walsh on November 8, 2018.  [D.E. 37.]

On November 13, 2018, Walsh moved for a 90-day extension to answer the Commission's Complaint [D.E. 39], which the Commission opposed.  [D.E. 40.]   On November 16, 2018, the Court denied Walsh's requested 90-day extension, finding that no good cause had been demonstrated to grant such broad relief and ordered Walsh to respond to the Commission's Complaint by December 14, 2018.  [D.E. 41.]  On December 14, 2018 – approximately four months after Walsh had notice of the Commission's Complaint – Walsh filed his answer.  [D.E. 44.]  On January 18, 2019, the Court granted a motion to withdraw as counsel filed by Criscione Ravala, LLP, the then attorney of record for Walsh, and ordered Walsh to retain new counsel on or before February 4, 2019 or to advise the Court if he intended to proceed *pro se* and, if so, to include in the notice his current residential address.  [D.E. 48.]  The Court also directed the Commission to serve all papers on Walsh by email at joedirect@gmail.com, and to the offices of Walsh's counsel in China, Lehman, Lee & Xu ("Lehman").  (*Id.*)

### B.   Walsh's Failure to Comply with His Discovery Obligations and the Court's Orders, and His Continued Delay Tactics

Notwithstanding the Court's January 18, 2019 Order which set a February 4, 2019 deadline for Walsh to obtain new counsel or advise the Court if he intended to proceed *pro se*, Walsh failed to comply with the Order.  On February 7, 2019, the undersigned sent a letter to Walsh – both to his joedirect@gmail.com address and to his counsel in China – notifying him that the February 4th deadline had past and requested that Walsh file the required notice with the Court no later than February 14, 2019.  ("February 7th Letter," Exhibit A.)  The February 7th Letter also informed Walsh that the Court had issued two orders setting a case schedule (enclosed with the letter), which included instructions and deadlines for, among other things, discovery, mediation, and

trial.  (*Id.*)   As part of these orders, the undersigned advised Walsh that he is required to comply with pretrial discovery in accordance with S.D. Fla. L.R. 16.1 and 26.1 and the Federal Rules of Civil Procedure.  (*Id.*)   To that end, the undersigned informed Walsh that pursuant to Rule 26(a)(1)(D) of the Federal Rules of Civil Procedure he was required to make his initial disclosures within 30 days after being served.  (*Id.*)  Because Walsh's initial disclosures were "long overdue," the undersigned requested Walsh to make his initial disclosures on or before February 14, 2019. (*Id.*)   The undersigned also enclosed the Commission's First Set of Interrogatories with the February 7th Letter and informed Walsh his responses thereto were due within 30 days, or by March 11, 2019. (*Id.*)  Finally, the undersigned requested Walsh to provide available dates during the first two weeks of April for his deposition.  (*Id.*)

On February 14, 2019, Walsh sent correspondence to the Court via email and copied the undersigned requesting an extension of time to find new counsel.  ("February 14th Letter," Exhibit B.)  In the February 14th Letter, Walsh stated, among other things, that he paid various amounts of money to his counsel in China, Lehman, but alleged that Lehman had not provided legal services on his behalf in this matter.  Walsh also stated that he was not in a financial positon to retain additional legal representation given that Lehman had allegedly not refunded his money.  (*Id.*) Walsh further suggested he had certain medical conditions keeping him in China and could not afford to fly to the United States for a deposition (or presumably any hearing), but could make himself available for a "teleconference" deposition.  (*Id.*)  Finally, Walsh requested that the Court either "enforce[] the attorneys" to represent him in this matter, or allow Walsh to find new counsel. (*Id.*)  In short, Walsh neither informed the Court that he would proceed *pro se* nor provided the Court with his residential address.  Instead, Walsh asked the Court to intervene in what appears to

be a contractual dispute between Walsh and his former attorneys and failed to provide a range of dates for his deposition in response to the undersigned counsel's requests.

On March 19, 2019, the undersigned sent Walsh an email underscoring his ongoing failure to comply with his discovery obligations and this Court's orders and asking him to contact the undersigned to discuss these outstanding matters. ("March 19th Email," Exhibit C.) The March 19th Email again advised Walsh of his discovery obligations and notified him that the deadlines to make his initial disclosures and to respond to the Commission's First Set of Interrogatories were overdue. (*Id.*) The March 19th Email requested that Walsh contact the undersigned no later than March 22, 2019. (*Id.*) Walsh never contacted the Commission's counsel, and he has neither provided initial disclosures nor responded to the Commission's interrogatories. Currently, the deadline for all discovery to be completed is August 16, 2019. [D.E. 47.]

### C.      Procedural Requirements of Federal Rule of Civil Procedure 55(b)(2)

Pursuant to Federal Rule of Civil Procedure 55(b)(2), attached to this motion as Exhibit D is an affidavit showing Walsh is not currently in the United States Military. A second affidavit is attached as Exhibit E indicating Walsh is neither an infant nor a minor. The same affidavit states Walsh is not incompetent.

### III.      MEMORANDUM OF LAW

### A.      Legal Standards

Pursuant to Fed. R. Civ. P. 37(c)(1)(C), the Court may sanction a party who fails to provide information or identify witnesses as required by Rule 26(a). The Court may also sanction a party who, after being properly served with interrogatories under Rule 33, fails to serve answers, objections, or a written response. Fed. R. Civ. P. 37(d)(1)(A)(ii). Permissible sanctions for either discovery violation include the striking of pleadings and the entry of default judgment. Fed. R.

Civ. P. 37(b)(2)(A)(iii), 37(b)(2)(A)(vi), 37(c)(1)(C); 37(d)(3); *see Buchanan v. Bowman*, 820 F.2d 359 (11th Cir. 1987) (striking answer and entering default judgment for, *inter alia*, failing to respond to interrogatories). *Pro se* parties are subject to sanctions under this provision. *See Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989). The Eleventh Circuit has indicated that the following findings must be made in order to impose a default judgment under Rule 37: (i) willful or bad faith noncompliance by the defendant; (ii) prejudice to the opposing party; and (iii) no adequate, available lesser sanctions. *Inmuno Vital, Inc. v. Telemundo Group, Inc.*, 203 F.R.D. 561, 571 (S.D. Fla. 2001) (citations omitted). On its face, Rule 37 does <u>not</u> require that a court formally issue an order compelling discovery before sanctions are authorized. *Allstate Ins. Co. v. Palterovich*, No 04-21402, 2008 WL 2741119, at *1 n.2 (S.D. Fla. 2008).

### B.       The Court Should Enter Default Judgment Against Defendant Walsh

This Court should enter default judgment against Walsh for failing to provide initial disclosures and serve any written response to the Commission's First Set of Interrogatories, and for otherwise failing to participate in pretrial discovery. This is because: (i) Walsh's actions demonstrate willful or bad faith noncompliance with the Federal Rules of Civil Procedure, S.D. Fla. L.R. 16.1 and 26.1, and this Court's orders; (ii) Walsh's failure to respond in this case demonstrates great prejudice to the Commission; and (iii) there are no adequate, available lesser sanctions.

#### 1.       *Walsh Has Willfully Abandoned His Defense of the Present Case*

The record makes clear that Walsh – who is a U.S. citizen that took up residence in China after questions were raised about his business dealings – has willfully abandoned his defense of this case and failed to comply with his pretrial discovery obligations and this Court's orders. [*See* D.E. 21 at ¶ 5 ("Pro se litigants, like all other litigants, must adhere to Federal Rules of Civil

Procedure and the Local Rules of the Southern District of Florida."), 26, 47.]  Walsh filed his answer approximately four months ago on December 14, 2018 – only after the Commission moved for alternative service based on its repeated attempts to serve Walsh at addresses he listed as current (including in filings with the Court), but in fact were not.  Since that time, Walsh has failed to:  (i) comply with the Court's January 18, 2019 Order setting a February 4, 2019 deadline for Walsh to obtain new counsel or advise the Court if he intended to proceed *pro se*; (ii) make initial disclosures pursuant to Rule 26(a)(1)(D) of the Federal Rules of Civil Procedure; (iii) answer or otherwise respond to the Commission's First Set of Interrogatories (Exhibit F); and (iv) confer with the Commission's counsel concerning Walsh's outstanding discovery and scheduling his deposition. (Exhibit C.)

Courts have granted default judgments where a defendant, like Walsh, willfully flouted discovery obligations and court orders.  *See, e.g.*, *Vaughn v. GEMCO2, LLC*, No. 17-cv-01713-CEM-LRH, 2018 WL 6620600, at *5 (M.D. Fla. Oct. 31, 2018) (recommending entry of default judgment against Defendants for failing to provide initial disclosures and answers to plaintiff's interrogatories and their willful noncompliance with court's discovery order); *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 489 (S.D. Fla. 1984) (neither the plaintiff nor the Court has the responsibility to drag a defendant, "kicking and screaming[,] through discovery.").  Walsh's repeated requests for multiple extensions of time – coupled with his abject failure to comply with his pretrial discovery obligations and this Court's orders – demonstrates his bad faith noncompliance.  For these reasons, it is undisputed that Walsh has intentionally abandoned his defense of this case.

### 2.      *Denying This Motion Would Severely Prejudice the Commission*

In light of Walsh's refusal to participate in the discovery process, it is nearly impossible for the Commission to proceed with its case against him.  Without a default judgment in place against Walsh, the Commission's case will remain stalled and more Commission and judicial resources will be unnecessarily expended.  With the August 16, 2019 discovery deadline fast approaching [D.E. 47], Walsh's willingness to defy this Court and ignore the Commission's repeated communications continues to prejudice the Commission.  Specifically, Walsh ignored the undersigned's:  (i) February 7th Letter which, among other things, notified Walsh that he failed to comply with the Court's January 18, 2019 Order [D.E. 48] and detailed Walsh's discovery obligations (Exhibit A); and (ii) March 19th Email which again underscored his failure to comply with the Court orders and his discovery obligations and asked him to contact the undersigned no later than March 22, 2019 to discuss the outstanding matters.  (Exhibit C.)  To date, Walsh has not responded to even the first of two communications sent by the undersigned more than two months ago.  Under these circumstances, the Commission will continue to be prejudiced if there is not a default judgment entered against Walsh.

### 3.      *There Is No Adequate, Lesser Sanction Available to the Commission*

Given Walsh's refusal to comply with prior Court orders and the undersigned's repeated attempts to communicate with him, a default judgment is the only appropriate sanction to address his blatant disregard for the rules and the ensuing prejudice to the Commission.  Although Walsh has failed to provide the Court or the undersigned his current residential address in China, Walsh has received and sent correspondence throughout the course of this case using his joedirect@gmail.com email address.  [*See* D.E. 34-7-10.]  The undersigned has provided Walsh numerous opportunities to discuss his discovery violations; accordingly, Walsh's failure to confer

with the undersigned cannot be attributed to negligence or confusion.   Rather, Walsh has demonstrated flagrant bad faith and callous disregard for his pretrial discovery obligations.  There is no reason to give Walsh an opportunity to cure his failure because he has repeatedly relinquished his pretrial discovery obligations and has otherwise refused to confer with the Commission's counsel and abide by this Court's orders.  A default judgment against Walsh is the only meaningful sanction.

### C.  The Factual Allegations Of The Complaint Are Deemed Admitted Against Walsh

In this case, the effect of a default judgment is that Walsh "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established."  *Buchanan*, 820 F.2d at 361.  The well-pleaded facts from the Complaint establishing Walsh's liability are as follows:

### 1.  *Overview of Walsh's Participation in the EB-5 Offering Fraud*

From November 2012 until March 2015, PHH raised at least $43,991,458 in investor funds from at least 88 foreign investors through an EB-5 offering of PHH limited partnership interests. [Compl., D.E. 1 ¶ 19.]  The offering materials provided to investors represented that PHH would loan investor funds to Palm House to acquire, develop, and operate the Hotel.  [*Id.*]  Instead, Walsh and Matthews misappropriated a significant portion of the investor funds.  [*Id.* ¶¶ 3, 27-29.]  Walsh, PHH, and SARC also made materially false and misleading statements to investors in connection with the EB-5 offering.  [*Id.* ¶ 3.]

Walsh, PHH, and SARC disseminated at least three versions of PHH's EB-5 false and misleading offering materials to investors.  [*Id.* ¶ 20.]  The offering materials included, among other documents, a private placement memorandum ("PPM"), to which a business plan, loan documents between PHH and Palm House ("loan documents"), a subscription agreement, a limited

partnership agreement, and an escrow agreement were attached. [*Id.*] The offering materials were combined with a multi-hundred page investment portfolio containing additional documents, including various versions of a project brochure that was translated into Chinese and Farsi and a document titled "EB-5 Process" that explained the EB-5 process. [*Id*. ¶¶ 20-21.] PHH offering materials appeared under some combination of one or more of the entities Walsh controlled, and the Hotel and SARC's logos. [*Id.* at ¶ 21.]

PHH, through Walsh and others, solicited investors through sales agents, who were provided with a copy of the investment portfolio and all of the offering materials. [*Id.* at 22.] Walsh substantially participated in the creation and dissemination of the materially false and misleading offering materials concerning the EB-5 offering of limited partnership interests in PHH. [*Id.* at 23.] Not only did Walsh provide information to USREDA's in-house counsel so that counsel could draft the false offering materials, Walsh also: (i) reviewed and approved all of the offering materials; (ii) signed certain offering materials as president and/or manager of SARC and USREDA; and (iii) edited, reviewed, and approved various versions of a project brochure and a document titled "EB-5 Petition" explaining the EB-5 process. [*Id.*]

### 2. *Material Misrepresentations and Omissions Concerning Walsh's Misappropriation of Investor Funds*

Between November 2012 and at least December 2014, the offering materials misrepresented that investor funds would be loaned to Palm House to acquire, develop, and operate the Hotel. [*Id.* ¶ 27.] In reality, Walsh, through PHH and SARC, misappropriated approximately $13,578,000 of investor funds. [*Id.*] First, Walsh misappropriated at least $8,078,000 of investor funds earmarked for the Hotel project, and then co-mingled those funds with other funds he controlled for his own use and to pay expenses unrelated to the Hotel project. [*Id.*] Second, in December 2013, Walsh made an undisclosed loan to Matthews of at least $5.5 million of investor

funds to save Matthews' personal Palm Beach mansion from foreclosure.  [*Id.*]  Walsh also knew that between February and December 2014 Matthews misappropriated millions of dollars of investor funds to purchase and pay for expenses associated with a 151-foot yacht, a piece of property located next to the Hotel, and to purchase his former home in Connecticut out of foreclosure.  [*Id.* ¶¶ 3, 27-29, 41-42.]

### 3.   *Material Misrepresentations and Omissions Concerning Escrow Requirements and the Return of Investor Funds*

Between November 2012 and at least June 2014, PHH's offering materials contained material misrepresentations concerning PHH's use of an escrow account for investor funds.  [*Id.* ¶ 30.]  PHH falsely claimed that investor funds would be held in an escrow account at PNC bank when, in reality, no escrow account ever existed for investor funds.  [*Id.*]  Indeed, prior to the PHH offering, the former CFO for SARC and USREDA informed Walsh that the account receiving investor funds would not even be administered by PNC Bank.  [*Id.*]

PHH's offering materials also contained material misrepresentations concerning the return of funds paid by investors.  [*Id.* ¶ 31.]  The offering materials, including the PPM and SARC's website, falsely and fraudulently stated that investors' funds would be returned if their I-526 petitions (Immigrant Petition by Alien Entrepreneur) were denied by USCIS.  [*Id.*]  For example, the brochures stated that "[USREDA] and South Atlantic Regional Center offers a 100% Full Refund of all fees and investment if your I-526 is not approved."  [*Id.*]  Some of these documents and SARC's website falsely and fraudulently referred to the promise of a return of the funds as a money back "guarantee."  [*Id.*]   PHH, SARC, and Walsh knew or recklessly disregarded that USREDA and SARC would not be able to repay investors whose petitions were denied because they misappropriated for their own use millions of dollars of investor funds, and never escrowed investor funds prior to their release to Palm House.  [*Id.* ¶ 32.]

4.    *Material Misrepresentations and Omissions Concerning Walsh and Matthews' Background*

PHH's PPMs and business plan contained material misrepresentations and omissions concerning Walsh's background in a section on "Management." [*Id.* ¶ 33.] Walsh drafted the description of his background which stated that he "has extensive experience in merger and acquisition strategy and law" and experience with "the intricacies of U.S. Securities and Exchange laws." Walsh did not have any such merger and acquisition or securities law experience. [*Id.*]

Matthews was described as the chairman of Matthews Ventures Holdings, LLC ("MVH"), a diversified holding company with interests in, among other things, real estate, hotels, and construction. [*Id.* ¶ 34.] However, PHH's PPMs and business plans materially omitted that in 2009, one of Matthews' companies, PB Realty Holdings LLC, was placed into involuntary bankruptcy with subcontractors obtaining approximately $2 million in judgments against Matthews, and that Matthews had lost to foreclosure both his own home, as well as the very Hotel in which investors were purportedly investing. [*Id.*] The offering materials also included a section on Matthews' brother, Gerry Matthews ("G. Matthews"), but did not disclose that he was a nominee for Matthews in the ownership of the Hotel because of Matthews' financial problems, a material omission. [*Id.* ¶ 35.] Walsh knew G. Matthews was a nominee for Matthews because of Matthews' financial problems. [*Id.* ¶ 35.]

5.    *Other Material Misrepresentations to PPH Investors*

The offering materials also made other material misrepresentations and omissions to PHH investors. [*Id.* ¶¶ 36-40.] The offering materials materially misrepresented the conditions precedent to the advancement of loan disbursements to Palm House. [*Id.* ¶ 36.] In particular, the PPMs stated, "it shall be a condition of each advance that as of such time there shall not have been a material adverse change in the operations, assets or financial condition of the [b]orrower and its

subsidiaries, taken as a whole." [*Id.*]  The loan documents made similar representations and stated that the determination as to material adverse changes would be made by PHH.  Walsh and PHH – which loaned at least $30,413,462 of investor funds to Palm House – never ascertained whether Palm House met these pre-conditions for any loan advance despite Matthews' misappropriation of approximately $7.9 million dollars of investor funds, which clearly represented material and adverse changes in the operations, assets, and financial condition of Palm House, 160 Royal, and the Hotel, all of which he controlled.  [*Id.* ¶¶ 36-37.]

The offering materials also made materially false and misleading statements concerning: (i) the preparation and periodic disclosure to investors of PHH financial reports and statements [*id.* ¶ 38]; (ii) Palm House making monthly interest payments to PHH on its loan for five years [*id.* ¶ 39]; and (iii) Palm House's purported ownership of, and substantial investment in, the Hotel prior to the commencement of the PPH offering [*id.* ¶ 40].

### D. Walsh Violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act

Counts I, II, and III of the Complaint allege Walsh violated Section 17(a) of the Securities Act, and Counts IV, V, and VI allege he violated Section 10(b) and Rule 10b-5 of the Exchange Act.  These provisions prohibit essentially the same type of conduct.  *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *SEC v. Unique Financial Concepts, Inc.*, 119 F. Supp. 2d 1332, 1339 (S.D. Fla. 1998), aff'd, 196 F.3d 1195 (11th Cir. 1999).  To establish a violation, the Commission must show:  (i) a misrepresentation or omission; (ii) that is material; (iii) made with scienter; (iv) in the offer of or in connection with the purchase or sale of a security.  *SEC v. Chemical Trust*, No. 00-8015-CIV-Ryskamp, 2000 WL 33231600, at *9 (S.D. Fla. Dec. 19, 2000).  As a fifth element, the Commission also must establish the use of interstate commerce, the mail, or a national

14

securities exchange. *SEC v. Corporate Relations Group*, No. 99-cv-1222, 2003 WL 25570113, at *7 (M.D. Fla. Mar. 28, 2003).

The Complaint alleges facts demonstrating that Walsh knowingly made numerous misrepresentations and omissions in PHH's offering materials. For example, Walsh knew that he, collectively with the entities he controlled, PHH and SARC, misappropriated at least $13,578,000 from investor funds and that Matthews misappropriated at least $7.9 million of investor funds. However, the offering materials failed to disclose this to investors and instead stated that investor funds would be loaned to Palm House to acquire, develop, and operate the Hotel. [Compl., D.E. 1 ¶¶ 27-29.] Walsh, PHH, and SARC also made false and materially misleading statements regarding: (i) the use of an escrow account to hold investor funds prior to disbursement to Palm House [*id.* ¶ 30]; (ii) the guaranteed return of investors' funds if their I-526 petitions were denied [*id.* ¶¶ 31-32]; (iii) Walsh and Matthews' backgrounds [*id.* ¶¶ 33-35]; (iv) the existence of conditions precedent to the advancement of loan disbursements to Palm House [*id.* ¶ 36-37]; (v) the preparation and periodic disclosure to investors of PHH financial reports [*id.* ¶ 38]; (vi) Palm House's repayment of the loan in monthly installments [*id.* ¶ 39]; and (vii) Palm House's purported ownership of and investment in the Hotel prior to the commencement of the PHH offering [*id.* ¶ 40].[3]

Additionally, the Complaint alleges facts showing Walsh, PHH, and SARC's misrepresentations and omissions were material. A statement or omission is considered material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made

---

[3] For purposes of Section 10(b) of the Exchange Act and Rule 10b-5, Walsh, PHH, and SARC are "makers" of statements contained in PHH's offering materials because they had ultimate authority over the statements contained in those documents, some of which Walsh signed or reviewed and approved, by virtue of Walsh's control over PHH and SARC. *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011).

available." *Basic v. Levinson*, 485 U.S. 224, 231 (1988).  Walsh, PHH, and SARC's misrepresentations and omissions were material to reasonable investors because they related directly to the safety and risk involved in the investment, use and misuse of investor funds, the nature of the company's business operations, and the failure to disclose negative aspects of Walsh and Matthews' backgrounds.

Further, the well-pleaded facts in the Complaint demonstrate that Walsh acted with scienter, as is required when proving a violation of Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.  Scienter is a mental state embracing intent to deceive, manipulate, or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness.  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). A finding of scienter is not required to establish a violation of Section 17(a)(2) or (3) of the Securities Act – only negligence is required.  *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

Walsh's actions show he acted with a high degree of scienter.  He knew or was severely reckless in not knowing the offering materials were misleading because of his knowledge that (i) PHH investors' funds were being misappropriated [Compl., D.E. 1 ¶¶ 27-29]; (ii) investors' funds were not held in escrow at PNC Bank [*id.* ¶ 30]; (iii) PHH would not return investors' funds if their I-526 petitions were denied [*id.* ¶¶ 31-32]; (iv) Walsh misrepresented his background and experience [*id.* ¶¶ 33-35]; (v) PHH did nothing to ensure that that there had been no material adverse change in Palm House prior to each advance of investor funds although it was obligated to do so [*id.* ¶¶ 36-37]; (vi) PHH did not provide financial reports to investors [*id.* ¶ 38]; (vii) Palm House did not make monthly interest payments and Walsh improperly retained prepaid interest from investor funds [*id.* ¶ 39]; and (viii) Matthews had adverse financial judgments, installed G.

16

Matthews as his nominee owner of the Hotel as a result, and did not have the represented equity invested in the Hotel [*id.* ¶¶ 18, 35]. PHH, SARC, and Walsh received money in connection with these material misrepresentations and omissions in the form of the investments and misappropriated funds. [*Id.* ¶¶ 41-42.] As the principal of SARC during the relevant period, Walsh's mental state is imputed to SARC and thus to PHH as SARC was its general partner. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (an individual's "knowledge is imputed to the corporations which he controlled").

Finally, the facts in the Complaint demonstrate the last two required elements of a violation of Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act. First, Walsh's actions were in connection with the purchase and sale of securities. He sold limited partnership interests in PHH through the dissemination of the offering materials to investors. [Compl., D.E. 1 ¶¶ 19-26]. Second, Walsh made use of the means of interstate commerce and communication in interstate commerce in executing his fraud. For example, he emailed sales agents that included links to PHH's offering materials and investment portfolio and disseminated material misrepresentations on SARC's website, which reached investors nationally and internationally. [*Id.* ¶¶ 22, 31.]

For all the foregoing reasons, the Commission has established a prima facie case that Walsh violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### E.   Permanent Injunctive Relief Is Warranted Against Walsh

The Commission is entitled to injunctive relief when it establishes (i) a violation of the federal securities laws, and (ii) a reasonable likelihood of future violations. *SEC v. Calvo*, 378

17

F.3d 1211, 1216 (11th Cir. 2004).  The Commission has already established the first prong by showing Walsh violated the federal securities laws.

In determining whether Walsh is reasonably likely to continue to violate the securities laws, this Court should consider the following factors:  (i) the egregiousness of his actions; (ii) the isolated or recurrent nature of his violations; (iii) the degree of scienter involved; (iv) the sincerity of Walsh's assurances against future violations; (v) Walsh's recognition of the wrongful nature of his conduct; and (vi) the likelihood that Walsh's occupation will present opportunities for future violations.  *Carriba Air*, 681 F.2d at 1332.  In this case, the factors set forth above weigh in favor of the Court entering a permanent injunction.

First, Walsh's conduct was egregious.  He played a substantial part in executing the fraudulent scheme through PHH, which ultimately fraudulently raised $43.9 million. [Compl., D.E. 1 ¶ 3.]  Second, because the offering fraud ran for over two years, Walsh's violations were not isolated.  Third, throughout the fraud, Walsh showed a high degree of scienter.  As discussed in detail above, he lied directly to investors concerning the use of investor funds, the nature of the investment and PHH's business operations – in addition to misappropriating millions of dollars.  Finally, as to the fourth and fifth factors, Walsh is currently residing at an unknown address in China and will not respond to the Commission's repeated communications.  Given these facts, the Court cannot have any assurances that he will avoid future misconduct.  Because of the egregious nature of his conduct and his wanton disregard of the laws, the Court should enter a permanent injunction.

### F.    <u>Disgorgement, Prejudgment Interest, And Civil Penalty</u>

Disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws.  *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978).

Where, as here, the fraud is "pervasive," the Court should order all profits stemming from the scheme to be disgorged. *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986). Courts are empowered to order wrongdoers to disgorge the amount of their profits from the wrongdoing. *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005). "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d. Cir. 1996), cert. denied. The Commission is entitled to disgorgement "upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). The Commission's burden for showing "the amounts of assets subject to disgorgement . . . is light . . . Exactitude is not a requirement." *ETS Payphones*, 408 F.3d at 735.

In addition to disgorgement, it is also appropriate for the Court to order Walsh to pay prejudgment interest. Requiring a defendant to pay prejudgment interest is consistent with the equitable purpose of the remedy of disgorgement. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996). A defendant's wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness. *SEC v. Tome*, 638 F. Supp. 638, 639 (S.D.N.Y. 1986).[4]

Lastly, the Court should order Walsh to pay a civil penalty. Under Section 20(d) of the Securities Act, 15 U.S.C. §77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. §78u(d), the Court may impose a civil penalty against him. The purposes of civil penalties are to punish the

---

[4] Prejudgment interest is normally calculated from the date the defendant receives the ill-gotten gains, in this case, Walsh's receipt of investor funds beginning November 2012. (Complaint, D.E. 1 ¶ 3.) However, 28 U.S.C. § 2462 limits disgorgement claims by the Commission to those filed within five years of accrual. The Commission filed the Complaint on August 3, 2018, so the appropriate date for prejudgment interest to begin accruing is August 3, 2013.

individual violator as well as deter future violations.  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998).

      The Commission requests that the Court allow it to file the appropriate motion setting the amounts of disgorgement, prejudgment interest, and any civil penalty within 120 days after the Court's entry of default judgment against Walsh.  During that time, the undersigned will seek authority from the Commission to pursue a specific disgorgement, prejudgment interest, and civil penalty amount from Walsh.

## IV.   <u>CONCLUSION</u>

      For the foregoing reasons, the Commission respectfully requests that the Court:  (a) grant the Commission's Motion to Strike Defendant Joseph J. Walsh, Sr.'s Answer and Enter Default Judgment of Permanent Injunction and Other Relief Against Him; (b) strike Walsh's answer and affirmative defenses [D.E. 44]; (c) permanently enjoin Walsh from future violations of the federal securities laws; and (d) order the other and further relief against Walsh as noted above.  For the Court's convenience, a proposed default judgment is provided.

Dated: April 16, 2019          Respectfully submitted,

             By:   **Jordan A. Cortez**
                     Counsel
                     Special Bar No. A5502524
                     Direct Dial: (305) 982-6355
                     Email: cortezjo@sec.gov

                     **Alejandro O. Soto**
                     Senior Trial Counsel
                     Florida Bar No. 172847
                     Direct Dial: (305) 982-6313
                     Email: sotoal@sec.gov

                     **ATTORNEYS FOR PLAINTIFF**
                     **SECURITIES AND EXCHANGE COMMISSION**

801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF notifications method on April 16, 2019 on all counsel or parties who are CM/ECF users and by the method indicated on non-CM/ECF users on the Service List below.

Jordan A. Cortez
Jordan A. Cortez

## SERVICE LIST

Via E-mail:  joedirect@gmail.com
Joseph J. Walsh, Sr.

Via FedEx
Joseph J. Walsh, Sr.
c/o Lehman, Lee & Xu
10-2 Liangmaqiao Diplomatic Compound No. 22
Dongfang East Road
Chaoyang District
Beijing 100600 China

21