UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PALM HOUSE HOTEL, LLLP, et al.,<br><br>Defendants and Relief Defendants. | Case No.:  9:18-CV-81038-DMM |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER APPROVING A DISTRIBUTION PLAN AND DIRECTING DISTRIBUTION**

Plaintiff Securities and Exchange Commission (the "SEC") submits this Memorandum in support of its motion for an Order approving the proposed distribution plan attached as Exhibit A and directing distribution in accordance with the Plan (the "Motion"). By the proposed distribution plan (the "Plan"), the SEC seeks to distribute to eighty-eight harmed investors over $6.6 million collected on its $27.6 million final judgment against relief defendant 160 Royal Palm, LLC ("Royal Palm"), as well as any additional collections in this matter.

Prior to filing this Motion, the SEC sent notice of the Plan (the "Investor Notice"), in both English and Simple Chinese, to all identified investors, as well as an English version to their identified counsel or representative.[1] The Investor Notice provided the background to this action, informed investors of the SEC-calculated Investment[2] and Recovery numbers for each investor, described the methodology by which Distribution Payments would be calculated, and

---

[1] Each Investor has been assigned an Investor number to protect their privacy, which has been communicated to them in the Investor Notice.  For the small subset of investors who spoke neither language, the SEC staff confirmed with their counsel or representative that the representative would translate the notice for the investor.
[2] Capitalized terms not defined herein are used as defined in the Plan.

provided directions on how to object to the Plan or propose corrections to the Investment and Recovery numbers, with a submission deadline of 11:59 p.m. EST on September 21, 2020. As discussed below, the SEC received one objection on behalf of forty-one investors and one request for documentation supporting the SEC's conclusion that the investor's investment had been transferred to another investment.[3] As further discussed below, pages 5-6 and note 8, the SEC was able to resolve the objection; and has provided documentation to the inquiring investor supporting the SEC's conclusion that, upon the investor's request, the investor's funds were transferred out of the investment at issue in this matter and into another investment.

In addition to investors, the SEC notified all parties of the intended filing more than a week prior to filing. The SEC is unaware of any additional objections to the relief sought by the Motion or corrections to Investment or Recovery numbers.

## I. Background

### A. The Civil Action

On August 18, 2018, the SEC filed a complaint against Palm House Hotel, LLLP ("PHH"), South Atlantic Regional Center, LLC ("SARC"), Joseph J. Walsh, Sr. ("Walsh"), Robert V. Matthews ("Matthews") (collectively, the "Defendants"), and named Royal Palm and the United States Regional Economic Development Authority LLC d/b/a EB5 Petition ("USREDA") as relief defendants.[4] The SEC alleged that, from November 2012 to March 2015, the Defendants defrauded eighty-eight investors participating in the Immigrant Investor Program (commonly referenced as the "EB-5" program) of approximately $44 million by misrepresenting

---

[3] The SEC also received correspondence confirming receipt of the Investor Notice; asking a question, which was answered; and what appeared to be an auto-response, which was forwarded to counsel representing that investor.

[4] *See* ECF No. 1.

2

that PHH would loan investor funds to Palm House LLC to acquire, develop, and operate the Palm House Hotel located in Palm Beach, Florida. The SEC alleged that, instead, Walsh and Matthews misappropriated a significant portion of the investor funds.

On November 20, 2019, the Court entered final judgment against Royal Palm, ordering it to pay disgorgement and prejudgment interest of $27,671,214.35 (the "Royal Palm Final Judgment").[5] By final judgments entered on March 11, 2020, the Court ordered SARC, Walsh and USREDA to pay a total of $65,172,165 in disgorgement and prejudgment interest, and ordered Walsh to pay a civil penalty of $8,078,000.[6]

**B.     The Bankruptcy Proceedings and Collections in this Action**

Royal Palm is the debtor in Chapter 11 bankruptcy proceedings pending in the Southern District of Florida (the "Royal Palm Bankruptcy").[7] The SEC filed a claim in the Royal Palm Bankruptcy and has collected over $6.6 million on that claim (the "Distribution Fund"). The Distribution Fund is currently held in an interest-bearing account at the U.S. Treasury's Bureau of Fiscal Services.

There are several other related bankruptcy proceedings which may result in collections in the captioned matter by the SEC and/or by investors who have filed proofs of claim: *United States Regional Economic Development Authority LLC*, 19-bk-25780 (Bankr. S.D. Fl.), *United States Regional Economic Development Authority, Inc.*, 19-bk-25799 (Bankr. S.D. Fl.); *Robert V. Matthews*, 17-bk-23426 (Bankr. S.D. Fl.), and *South Atlantic Regional Center, LLC*, 19-bk-25762 (Bankr. S.D. Fl.). With the Royal Palm Bankruptcy, these proceedings are collectively

---

[5] ECF No. 67.
[6] *See* ECF Nos. 93-95. Although the Court entered a judgment against Matthews imposing, among other things, a permanent injunction (ECF No. 56), the imposition of monetary relief was deferred and no final judgment has been entered against Matthews.
[7] *160 Royal Palm, LLC*, 18-bk-19441 (Bankr. S.D. Fl.).

3

referenced herein as the "Bankruptcy Proceedings." Any additional distribution to the SEC in the Bankruptcy Proceedings or any other collections on the final judgments entered in this action, as well as accrued interest, will be added to the Distribution Fund.

**C.    Harmed Investors**

The SEC has identified eighty-eight investors in PHH who were harmed by the Defendants in an aggregate amount exceeding $48 million (the "Harmed Investors") -- approximately $44 million in investments and an additional $4.4 million in transaction fees.[8] On average, with transaction fees, each Harmed Investor invested approximately $550,000.

Of the eighty-eight Harmed Investors, eighty-one have recovered approximately 20% of their Investments through the Royal Palm Bankruptcy (the "Bankruptcy Investors"); the remaining seven Harmed Investors have recovered nothing. Specifically, the Bankruptcy Investors each filed a claim in the Royal Palm Bankruptcy, seeking to recoup some of their losses from Royal Palm's estate. These investors and the bankruptcy trustee (the "Trustee") agreed to settlements by which the Trustee recognized reduced, unsecured creditor claims of

---

[8] In response to the Investor Notice, an investor reflected in the SEC records as having withdrawn his investment from PHH in favor of another EB-5 investment, requested documentation of the transfer of their funds. The investor did not deny seeking to withdraw and reinvest the funds; rather, the investor sought proof that the reinvestment occurred. The SEC provided to the investor records obtained from the United States Citizenship and Immigration Services ("USCIS"), including a PNC Bank "current day summary and detail report" evidencing the transfer of the investor's funds from a bank account associated with the PHH project to the bank account of the requested, alternative, EB-5 investment. The SEC has also confirmed with the USCIS that USCIS records reflect the investor's voluntary withdrawal of his PHH EB-5 petition, and the investor's submission of an EB-5 Petition in the alternative investment that was ultimately denied. The SEC believes this information and documentation put to rest any question as to the investor's withdrawal of their funds from the PHH project. Notwithstanding, the SEC has informed the investor that, if, prior to distribution under a Court-approved Plan, the investor provides to the SEC information that undermines the information and documentation described above, the SEC will re-evaluate its conclusion.

each Bankruptcy Investor at 80% of the initial claim amounts, and distributed to each just over 24% of their reduced claims.[9]

Several, if not all, of the Bankruptcy Investors also have filed claims in the other Bankruptcy Proceedings.  Moreover, several of the Bankruptcy Investors are seeking, and some have obtained small recoveries through private litigation, including two class actions:  *Li, et al. v. Walsh, et al.*, 16-cv-81871 (S.D. Fl.) and *Li, et al. v. PNC Bank NA, et al.*, 19-cv-80332 (S.D. Fl.), and a state action captioned *Chenglin, Liu v. Third Seven Capital LLC*, Civ. Act. No. 502018 CA 014081XXXXMB, Fl. Circuit & County Court, Palm Beach (the "Private Recoveries").[10]

### D. The Plan and the Resolved Objection

The SEC proposes to distribute the Distribute Fund to Harmed Investors as described in the Plan, as further explained below.

#### 1. *Definitions Relevant to the Plan Methodology and Resolution of the Objection*

Potentially Eligible Investors under the Plan are those individuals or entities who purchased limited partnership interests in PHH (the "Security") and suffered a loss as a result of the conduct described in the Complaint.  Investments are defined as the total amount paid by Potentially Eligible Investors to the Defendants in connection with the purchase of the Security, determined based on the bank records of the Defendants and generally comprised of a $500,000 investment and an administrative fee.  Those excluded from the distribution include the

---

[9] *See, e.g.*, *Royal Palm Bankruptcy* ECF No. 1720, ¶¶ 16 et seq.  (Motion for Approval of Settlement with Twenty Pro Se EB-5 Creditors, describing the current and historical settlements).  *See also* Royal Palm Bankruptcy ECF Nos. 1050, 1469, 1521, 1073, 1127, 1467, 1521, 1678, 1752, 1760, 1771.

[10] The SEC is aware of individual recoveries against specific defendants ranging from $22,000 to $60,000.  The litigation of these actions continues.

Defendants and the Relief Defendants, as well as Potentially Eligible Investors who cannot be located or are unresponsive upon reasonable outreach efforts by the Distribution Agent, and the Distribution Agent and its agents. There is a $25 *de minimis*, below which Potentially Eligible Investors will not receive a Distribution Payment.

In the Investor Notice, the SEC originally proposed "Recovery" to include all recoveries prior to the execution of the Plan, including Private Recoveries. Counsel representing 41 of the 88 Harmed Investors (the "Objecting Investors"), all of whom are Bankruptcy Investors, objected to this definition, requesting an alternative methodology or the offset of attorney fees from recoveries. The SEC is statutorily barred from paying directly, or indirectly through an offset, attorney fees from the Distribution Fund.[11] Moreover, the SEC believes the Rising Tide methodology, discussed below, is the most fair and equitable distribution methodology under the current circumstances. However, for a number of reasons, including: (1) the SEC's belief that it is in the best interest of investors to file the Plan with the Court without objection; (2) the difficulty of ensuring current and accurate accounting of the Private Recoveries, some of which involve non-disclosure agreements; (3) the improbability that any Harmed Investor's recovery to date, plus the SEC's distribution, will result in a windfall to that Harmed Investor; and (4) the recognition that several of the Harmed Investors who have participated in the Private Recoveries

---

[11] Section 20(f) of the Securities Act of 1933 [15 U.S.C. § 77t(f)] and Section 21(d)(4) of the Securities Exchange Act of 1934 [15 U.S.C. 78(u)(d)(4)] each provide:

> (4) PROHIBITION OF ATTORNEYS' FEES PAID FROM COMMISSION DISGORGEMENT FUNDS.
> Except as otherwise ordered by the court upon motion by the Commission, …, funds disgorged as the result of an action brought by the Commission in Federal court, …, shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds.

have and will incur substantial attorney fees, the SEC has adjusted the definition of Recoveries to include only recoveries under the Plan and recoveries from the Bankruptcy Proceedings, and not the Private Recoveries. This adjustment will benefit the Objecting Investors by not offsetting any of their Private Recoveries from their distribution under the Plan; although, to avoid future windfalls, the adjustment is accompanied by counsel's agreement to disclose in the private actions their recoveries in this action.[12] By electronic mail exchange dated October 15, 2020, the Objecting Investors informed the SEC that the proposed adjustment to the Plan resolves their objections.

### 2. *The Plan Methodology*

In the Plan, the SEC proposes using the "rising tide" methodology to calculate Distribution Payments so that the seven Harmed Investors who have Recovered nothing receive at least as much as the Bankruptcy Investors before more is distributed to the Bankruptcy Investors. Under the rising tide methodology, any Recoveries previously obtained by Harmed Investors through withdrawals, interest payments, distributions in related actions, or otherwise, are considered distributions. Anyone who has previously Recovered some of their Investment will not get a distribution until those who have little or no Recovery recoup the same percentage (the "Recovery Ratio"), after which point, all Harmed Investors receive a *pro rata* share of the Distribution Fund.

Using the rising tide approach and based on preliminary calculations,[13] all Eligible Investors will get a distribution that would bring their respective aggregate Recoveries to

---

[12] The SEC also will undertake to inform those litigants of whom it knows of the distributions in this matter.

[13] The SEC expects that the numbers will change based on, among other things, the balance in the Distribution Fund upon the completion of collections and the calculation of Administrative Costs.

7

approximately 35%. Under this methodology, the Bankruptcy Investors will receive an average Distribution Payment of approximately $64,000, and the seven Eligible Investors who have recovered nothing (the "Remaining Investors") will receive an average Distribution Payment of approximately $196,000.

By way of example, the chart below reflects the use of the rising tide methodology to determine the Distribution Payment for two of the eighty-eight Harmed Investors. Investor A is a Remaining Investor; Investor B is a Bankruptcy Investor. In this example, preliminary calculations show that Investor A will receive a distribution payment of $196,000 and Investor B will receive a Distribution Payment of $64,845.10, resulting in both Harmed Investors recovering a total of 35% of their Investment.

| Line | Line Identification | Investor A | Investor B |
|---|---|---|---|
| 1 | Investment | $560,000.00 | $560,000.00 |
| 2 | Recovery Ratio | 35.00% | 35.00% |
| 3 | Amount Necessary for 35% Recovery (Line 1*Line 2) | $196,000.00 | $196,000.00 |
| 4 | Recovery | $ - | $131,154.90 |
| 5 | Percent Recovered (Line 4/ Line 1 as a percent) | 0.00% | 23.42% |
| 6 | Distribution Payment (Line 3-Line 4) | $196,000.00 | $64,845.10 |
| 7 | Final Percent Recovered with Distribution Payment ((Line 4+Line 6)/Line 1 as a percent) | 35.00% | 35.00% |

Because using the rising tide methodology results in significantly larger distributions to the seven Remaining Investors, the SEC considered the net loss methodology as an alternative approach.

The net loss methodology also results in all Harmed Investors receiving a distribution, but the disparity in distributions is less. However, preliminary calculations show that while the use of this method significantly reduces the percent recovery of the Remaining Investors, the Bankruptcy Investor percent recovery is minimally increased. Specifically, the Bankruptcy Investors would receive an average Distribution Payment of approximately $73,000, with an

average Recovery of 36.67%, while the Remaining Investors would receive an average Distribution Payment of approximately $96,000 with an average Recovery of 17.36% of their losses.

Again for example, the chart below reflects the use of the net loss methodology to determine the Distribution Payment for Investor A and Investor B. Preliminary calculations show that Investor A will receive a Distribution Payment of $96,880.00 and Investor B will receive a Distribution Payment of $74,190.20, resulting in their respective total Recoveries of 17.30% and 36.67% of their Investments.

| Line | Line Identification | Investor A | Investor B |
|---|---|---|---|
| 1 | Investment | $560,000.00 | $560,000.00 |
| 2 | Recovery | $      - | $131,154.90 |
| 3 | Net Loss (Line 1-Line 2) | $560,000.00 | $428,845.10 |
| 4 | Pro Rata Percentage (Net Available Distribution Amount (est. $6.6 million )/ aggregate Net Losses | 17.30% | 17.30% |
| 5 | Distribution Payment (Line 3 * Line 4) | $96,880.00 | $74,190.20 |
| 6 | Total Recovery with Distribution Payment | $96,880.00 | $205,345.10 |
| 7 | Final Percent Recovered with Distribution Payment (Line 6+Line 2)/Line 1, as a percent) | 17.30% | 36.67% |

Based on that above, and as further discussed below, the SEC believes the rising tide methodology results in the most equitable distribution of the Distribution Fund.

## II. This Court Should Approve the Plan and Order Distribution in Accordance with the Approved Plan

A district court has broad discretion in approving an SEC plan of distribution, and that determination is reviewed for abuse of discretion. *See SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017); *SEC v. Malek*, 397 Fed. Appx. 711, 715 (2d Cir. 2010), *citing SEC v. Loewenson*, 290 F.3d 80, 87 (2d Cir. 2002); *WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006). *Cf. SEC v.*

9

*Pension Fund of Am. L.C.,* 377 F. App'x 957, 961 (11th Cir. 2010) (district courts have broad powers and wide discretion to determine the appropriate relief in an equity receivership and applying an abuse of discretion in reviewing a district court's supervision of the receivership); *SEC v. Elliott,* 953 F.2d 1560, 1569-70 (11th Cir. 1992) (same). The job of the district court is to ensure that the proposed plan of distribution is fair and reasonable. *Quan*, 870 F.3d at 762; *WorldCom*, 467 F.3d at 83-85 (because the SEC is fulfilling a statutory role in determining how to distribute recovered funds to investors, it is entitled to the deference of a "fair and reasonable" standard—that the plan fairly and reasonably distributes limited funds among the Potentially Eligible Investors). *See also SEC v. EB5 Asset Manager, LLC*, 15-CV-62323, 2016 U.S. Dist. LEXIS 170698, *7 (S.D. Fl. Dec. 8, 2016), *adopted*, 2016 U.S. Dist. LEXIS 180591 (S.D. Fl. Dec. 27, 2016) (the goal of the distribution plan should be to treat each victim of the investment fairly and as nearly equal as possible); *SEC v. Detroit Mem'l Partners, LLC*, 13-cv-1817-wsd, 2016 U.S. Dist. LEXIS 154474, *35 (Nov. 8, 2016 N.D. Ga.) (the district court has broad discretion to approve a receiver's distribution plan that is reasonable and equitable), *citing SEC v. Wang*, 944 F.2d 80, 88 (2d Cir. 1991); *SEC v. Homeland Communs. Corp.*, 07-cv-80802-Marra, 2010 U.S. Dist. LEXIS 57961, *4 (S.D. Fl. May 24, 2010) (no specific scheme is mandated so long as the distribution is fair and equitable) (internal citations omitted).

In this case, the SEC proposes using the rising tide methodology to ensure that those Harmed Investors who have Recovered some of their Investment do not get additional funds through the SEC distribution until those who have Recovered none of their Investment receive some of that investment back.[14] The SEC believes this methodology to be the most fair and reasonable approach to distribution under the circumstances here—limited funds and Harmed

---

[14] Plan, ¶¶ 16-18.

Investors with significantly varying Recoveries. *See SEC v. Torchia,* 14-cv-3904-wsd, 2017 U.S. Dist. LEXIS 8761, *28-30 (N.D. Ga. Aug. 7, 2017), *aff'd* 729 Fed. Appx. 772 (11th Cir. 2018) (approving a receiver's plan, finding the rising tide methodology equitable where, among other things, other methodologies would result in some investors recovering "as little as 16.2% of their investment). *See also SEC v. Alleca*, 12-cv-3261-wsd, 2017 U.S. Dist. LEXIS 153660, *12 (N.D. Ga. Sep. 21, 2017) (finding a rising tide allocation to be a fair and equitable method of distributing receivership assets). As demonstrated above, the detrimental effect of using a net loss methodology on the Remaining Investors is far greater than the adverse effect of using the Rising Tide methodology on the Bankruptcy Investors.

The remainder of the Plan is also fair and reasonable. District Courts have discretion to exclude claimants involved in the underlying scheme. *See Pension Fund*, 377 F. App'x at 963 (no abuse of discretion to exclude directors and sales agents from distributions). The Defendants and Relief Defendants who benefitted from the conduct underlying the misconduct should not benefit from this distribution, either directly or indirectly.[15] Moreover, for reasons of practicality and efficiency, Harmed Investors who do not timely provide necessary information and/or who cannot be located by the Distribution Agent through reasonable efforts are excluded under the Plan. The minimum distribution amount of $25 is set with a view to feasibility – the costs attributable to locating and issuing a payment to a foreign national.[16]

Additional distributions may occur if additional funds are received and/or if otherwise feasible.[17] If a determination is made by the Distribution Agent, in consultation with the SEC, that additional distributions are not feasible, money remaining in the account after the

---

[15] Plan, ¶ 7(e).
[16] Plan, ¶ 7(g).
[17] Plan, ¶ 49.

completion of all distributions and the payment of all Administrative Costs (the "Residual") will be transferred to the SEC, pending a final accounting.[18] Upon completion of the final accounting, the SEC staff will file a motion with this Court to approve the final accounting, which will include a recommendation as to the final disposition of the Residual consistent with *Liu v. SEC*, 140 S. Ct. 1936 (2020). If distribution of the Residual to investors is infeasible, the SEC staff may recommend that the monies be transferred to the general fund of the U.S. Treasury subject to Section 21F(g)(3) of the Exchange Act.[19] In moving this Court to approve the final accounting, the SEC staff will also seek from the Court, if and as appropriate, an Order that discharges the Distribution Agent and terminates the Distribution Fund.[20]

The remaining provisions of the plan provide for the careful and orderly distribution of the Distribution Fund. The SEC believes that the Plan fairly and reasonably distributes the Distribution Fund to investors harmed by the conduct underlying the Complaint and respectfully requests that the Plan be approved and distribution ordered.

---

[18] Plan, ¶ 48.
[19] Section 21F(g)(3) of the Exchange Act, 15 U.S.C. § 78u-6(g)(3), provides, in relevant part, that any monetary sanction of $200 million or less collected by the SEC in any judicial action brought by the SEC under the securities laws that is not added to a disgorgement fund or Distribution Fund or otherwise distributed to victims, plus investment income, shall be deposited or credited into the SEC Investor Protection Fund.
[20] Plan, ¶ 52.

### III. Conclusion

For the reasons set forth above, the SEC respectfully requests that the Court grant the requested relief.

Dated: November 10, 2020                  Respectfully submitted,

/s/ Catherine E. Pappas
Catherine E. Pappas (PA Bar 56544)
pappasc@sec.gov
U.S. Securities and Exchange Commission
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
(215) 597-0657

Attorney for Plaintiff United States
Securities and Exchange Commission

Exhibit A (Proposed Plan)

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served as indicated on November 10, 2020 on all counsel or parties of record on the Service List below.

/s/ Catherine E. Pappas
Catherine E. Pappas

## Service List

*Via CM-ECF*
Christopher W. Kammerer
Email: ckammerer@kammerermariani.com
John F. Mariani
Email: jmariani@kammerermariani.com
KAMMERER MARIANI PLLC
1601 Forum Place, Suite 500
West Palm Beach, FL 33401
*Robert V. Matthews*

*Via Email (ECF 36)*
joedirect@gmail.com
Joseph J. Walsh, Sr.
(ECF 36)

Philip J. Landau
Eric Pendergraft
Shraiberg, Landau, & Page P.A.
2385 N.W. Executive Center Dr.
Suite 300
Boca Raton, FL 33431
plandau@slp.law
EPendergraft@slp.law
*Liquidating Trustee, 160 Royal Palm LLC*

*Via UPS and Email (ECF 36)*
Joseph J. Walsh, Sr.,
c/o Henry Bennett Handler, Esq.  Weiss, Handler & Cornwell, P.A.
2255 Glades Road, Suite 218A
Boca Raton, FL 33431-7391
hbh@whcfla.com

*Via Email*
Sonya S. Slott
The Salkin Law Firm PA
950 South Pine Island Road, Suite A-150
Plantation, Florida 33324
sonya@msbankrupt.com

Glenn D. Moses, Esq.
Genovese, Joblove & Battista, P.A.
Bank of America Tower, 44th Floor
100 Southeast Second Street Miami, FL 33131
gmoses@gjb-law.com
*Ch. 7 Trustee, US Regional Economic Development Authority LLC*

Scott N. Brown, Esq.
Bast Amron LLP
Sun Trust International Center
One Southeast 3rd Ave., Suite 1400
Miami, FL 33131
sbrown@bastamron.com
*Trustee, South Atlantic Regional Center, LLC*

**Via UPS (per ECF system)**

160 Royal Palm, LLC
Registered Agent: Leslie R. Evans
214 Brazilian Ave., #200
Palm Beach, FL 33480

Palm House Hotel, LLLP
9250 Belvedere Road
Suite 101
Royal Palm Beach, FL 33411

South Atlantic Regional Center, LLC
9250 Belvedere Road
Suite 101
Royal Palm Beach, FL 33411

United States Regional Economic Development Authority LLC
9250 Belvedere Road
Suite 101
Royal Palm Beach, FL 33411